# EXHIBIT 1

## STATE OF MICHIGAN
## MICHIGAN ADMINISTRATIVE HEARING SYSTEM

In the matter of:

Miguel Luna Perez, Maria Perez,
and Jose Luna,

      Petitioners,

v.

Sturgis Public Schools, Sturgis Public Schools
Board of Education, St. Joseph Intermediate
School District, St. Joseph Intermediate School
District Board of Education,

      Respondents.

Docket No.:

Case No.:

Agency:    Department of Education

ALJ:

---

Mark Cody (P42695)
Michigan Protection and Advocacy Service, Inc.
Attorney for Petitioners
4095 Legacy Parkway, Ste. 500
Lansing, MI 48911-4263
(517) 487-1755
mcody@mpas.org

Caroline Jackson *(Admission pro hac vice pending)*
Anna Bitencourt *(Admission pro hac vice pending)*
Attorneys for Petitioners
National Association of the Deaf Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
(301) 587-7466
caroline.jackson@nad.org
anna.bitencourt@nad.org

---

## COMPLAINT AND REQUEST FOR
## SPECIAL EDUCATION DUE PROCESS HEARING
## I. INTRODUCTION

    1.    Petitioners, Miguel Luna Perez ("Miguel" or "the Student"), Maria Perez and Jose

Luna ("the Parents") (collectively "Petitioners"), by and through their undersigned counsel,

hereby submit the following Complaint and Request for a Special Education Due Process Hearing against Sturgis Public School ("Sturgis" or "the District"), Sturgis Public Schools Board of Education ("Sturgis Board"), St. Joseph Intermediate School District ("the ISD"), and St. Joseph Intermediate School District Board of Education ("the ISD Board"), (collectively "Respondents"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*; the Michigan Administrative Rules for Special Education ("MARSE"), Michigan Admin. Code R. 340.1701 *et seq.*; the Michigan Persons with Disabilities Civil Rights Act ("PDCRA"), M.C.L. 37.1101 *et seq.*; Section 504 of the United States Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; and Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. §§ 12131 *et seq.*

2.    Petitioners contend that throughout Miguel's educational career, Respondents have failed to provide him with a free and appropriate public education ("FAPE"), as required by the IDEA and the MARSE, have failed to provide him with an equal educational opportunity, and have discriminated against him on the basis of his disability, in violation of Section 504 and the ADA.

## II. JURISDICTION

3.    The Michigan Department of Education ("MDE") and the Michigan Administrative Hearing System ("MAHS") have jurisdiction over this due process hearing request under 20 U.S.C. § 1415(b)(6) because this request concerns the legal obligations of Respondents under the IDEA regarding the identification, evaluation, educational placement, and provision of a FAPE to a student with a disability.

## III. PARTIES

2

4.      Miguel Luna Perez is a 22-year-old student with a disability who resides with his parents, Maria Perez and Jose Luna, in the Sturgis Public School District. Their address is 605 Enterprise Street, Sturgis, MI 49091. Miguel currently attends the Michigan School for the Deaf ("MSD") in Flint, Michigan. Previously, from 2004 through 2016, Miguel attended school in the District. Miguel is a student with a disability, as defined by the IDEA and the MARSE under the category of Hearing Impairment. He is also an individual with a disability within the meaning of Section 504, the ADA, and the PDCRA as he has a physical impairment that substantially limits one or more major life activities, including hearing and speaking.

5.      Maria Perez and Jose Luna are Miguel's biological parents.  Ms. Perez and Mr. Luna were Miguel's legal guardians until he reached the age of majority. Ms. Perez's and Mr. Luna's primary language is Spanish.

6.      Sturgis Public Schools is Miguel's home district and as such, is the local education agency ("LEA") responsible for providing him with a FAPE and the procedural protections required under the IDEA. Sturgis is a recipient of federal financial assistance, subject to the requirements of Section 504, 34 C.F.R. § 104.11, and a public governmental entity subject to the provisions of the ADA, 42 U.S.C. §§ 12132, 12131(1)(A), (B).

7.      Sturgis Public Schools Board of Education ("Sturgis Board") is the Board of Education for Sturgis Public Schools. The Sturgis Board "exists for the purpose of providing a system of free, public education for students in grades Pre-K - 12 inclusive."[1] The Sturgis Board has the authority to supervise Sturgis.[2] Its powers include educating students and hiring, contracting for, scheduling, supervising, or terminating employees, independent contractors, and

---

[1] Sturgis Public Schools Bylaws and Policies, Section 0112 "Purpose," available at http://www.neola.com/sturgis-mi/.
[2] *Id.*, Section 0121 "Authority."

others who work at Sturgis.[3] These powers also include making many different kinds of decisions regarding the evaluation, compensation, discipline, and discharge of individual Sturgis personnel.[4] The Sturgis Board is responsible for ensuring Sturgis complies with state and federal laws, including special education and disability rights laws, and to establish district-wide policies.[5]

8.    St. Joseph Intermediate School District ("the ISD") is the regional educational service agency, as defined in M.C.L. 380.4(3), of which Sturgis is a constituent school district. The ISD provides special education services and supports to its constituent LEAs, including speech and language therapy and services for deaf and hard of hearing students.[6] Additionally, the ISD receives federal funding to provide special education services. MARSE R. 340.1801. St. Joseph ISD representatives have participated in Miguel's Individualized Education Program ("IEP") meetings.

9.    The ISD Board of Education ("ISD Board") is the legal entity for providing specialized educational services within the ISD.[7] The ISD Board "exists to serve as a liaison agency between the local school districts in St. Joseph and portions of contiguous counties or the State Department of Education and to provide those educational programs and services requested by the constituent districts or mandated by the State."[8] The ISD Board supervises the ISD.[9] Its powers include educating students and hiring, contracting for, scheduling, supervising, or terminating employees, independent contractors, and others who work at the ISD.[10] These powers also include making many different kinds of decisions regarding the evaluation,

---

[3] *Id.*, Section 0122 "Board Powers."
[4] *Id.*
[5] *Id.*, Section 0123 "Philosophy of the Board."

[13] http://www.michiganschoolforthedeaf.org/content/school-history
[13] http://www.michiganschoolforthedeaf.org/content/school-history
[13] http://www.michiganschoolforthedeaf.org/content/school-history
[13] http://www.michiganschoolforthedeaf.org/content/school-history

compensation, discipline, and discharge of individual ISD personnel.[11] The ISD Board is responsible for ensuring the ISD complies with state and federal laws, including special education and disability rights laws, and to establish district-wide policies.[12]

## IV. STATEMENT OF FACTS

10.    Miguel is deaf. He has no other disabilities.

11.    Miguel began attending Sturgis Public Schools in 2004 at the age of nine, having just moved to the United States from Mexico with his parents.

12.    Miguel's parents speak only Spanish. They require a Spanish-language interpreter to participate in school meetings, such as IEP team meetings, and they require Spanish-language translation of all written materials.

13.    In Mexico, Miguel had had no formal education and arrived in the United States knowing only a few gestures that he used to communicate with his parents. He did not know a formal sign language. Miguel could not read lips, and he could not speak any words in Spanish or English. He could not read or write.

14.    Despite this early setback, a cognitive evaluation conducted by the District in 2004 stated that Miguel's "intellectual potential is at least Low Average, and quite possibly higher." The report explained that "[c]onsidering his profound hearing loss and uncertain school history, the results of the [intelligence test] should be considered a minimal estimate of his potential level of intellectual functioning."

15.    Miguel's teachers at the time described Miguel as curious, hard-working student who loved to learn, and would willingly use the signs taught to him.

---

[13] http://www.michiganschoolforthedeaf.org/content/school-history
[13] http://www.michiganschoolforthedeaf.org/content/school-history

16.    St. Joseph Intermediate School District provided a Teacher of the Deaf, who recommended that Miguel receive instruction in American Sign Language ("ASL").

17.    ASL is the predominant language used by deaf and hard of hearing individuals in the United States. It is a complete language with its own vocabulary, grammar, and discourse structure.

18.    Sturgis recognized the recommendation to instruct Miguel in ASL, but failed to implement the recommendation in a manner reasonably calculated to enable Miguel to learn.

19.    Instead, Sturgis provided limited access to sign language models, primarily relying on an individual who had attempted to learn sign language from a book. Further, there were lengthy periods of time in which Sturgis provided no direct instruction in sign and no interpreting services at all.

20.    Consequently, after attending school in the District without interruption for 12 years, Miguel still did not know any formal sign language. Indeed, he could not even follow simple directions given in sign language. He could not speak any words or understand speech. His reading and writing ability did not approach functional literacy.

21.    Instead, Miguel communicated through an idiosyncratic method of invented signs that Sturgis misled Miguel and his family to believe was "Signed English." However, this signing system was insufficient to allow Miguel to communicate with anybody unfamiliar with his unique signing method, and was insufficient to allow Miguel to understand even simple instructions given in Signed English or ASL.

22.    In a 2016 test of his ability to understand words and sentences conveyed in sign language, he scored at a level less than 1% of his peers.

6

23.    In a 2016 test of his ability to recognize sight vocabulary words, he achieved a score of less than 0.1% of his peers.

24.    Miguel spent 12 years at Sturgis Public Schools in an environment that did not teach him language and did not give him language access to his surroundings.

25.    Beginning in 2004, Sturgis implemented an IEP that was not reasonably calculated to ensure that Miguel made appropriate progress in light of his circumstances or that he had communication access to his learning environment.

26.    Since 2004, Miguel's IEP consistently noted that he "cannot hear or speak complete sentences to communicate." Nevertheless, from 2004-2016, Sturgis placed Miguel in a general or special education classroom without instruction in ASL or an ASL interpreter.

27.    From 2004-2008, his IEP noted "[a] teaching assistant will be available to him throughout the day to sign information to him, but not necessarily with him individually all day."

28.    Beginning in 2009, Sturgis described the teaching assistant as "with him during academic classes to provide tutoring and sign instruction as needed."

29.    In addition, Sturgis provided Miguel with a few hours per week with the Teacher of the Deaf and/or with speech and language services.

30.    On information and belief, this "teaching assistant" did not hold a teaching credential, had no training or experience in teaching deaf students, had no training or experience as an interpreter, and did not know any sign language.

31.    On information and belief, this teaching assistant's sole qualification for her position was her attempt to teach herself Signed English by reading a book.

32.    Signed English is not ASL. Signed English borrows from the ASL lexicon, adapts the signs to correspond exactly with English words, and is produced according to English rules

7

for grammar, etc. Although Signed English can be suitable for the educational setting, it cannot be learned solely from a book.

33. On information and belief, Sturgis did not choose Signed English over ASL for pedagogical reasons or with consideration for Miguel's needs. Rather, Sturgis chose Signed English because of the belief it would be easier for the teaching assistant to learn.

34. Because the teaching assistant, who attempted to learn Signed English from a book, is not an interpreter, she could not provide Miguel with access to the general or special education teachers in his environment. Rather, she served as Miguel's only source of instruction.

35. In 2012, Miguel received a cochlear implant. Although the implant enabled Miguel to detect sound, he could not detect any patterns in the sounds he perceived. The cochlear implant did not improve his ability to understand speech.

36. Beginning in approximately 2015, Sturgis took away Miguel's teaching assistant for four hours per day, leaving Miguel with no means of communicating with staff or students.

37. Sturgis discontinued speech-language services in 2015, incorrectly deeming Miguel "able to functionally communicate through sign and writing."

38. In May 2016, Miguel's IEP describes him as using Signed English as his primary mode of communication. The IEP states he can participate in a conversation in Signed English only on familiar topics—meaning that at the age of 20, having no intellectual disability of any kind, after 12 years in Sturgis Public Schools, Miguel still had no ability to discuss unfamiliar topics regardless of how communication occurred.

39. In reading and writing, he tested at a 1st to 3rd grade level. The IEP noted that Miguel is "unfamiliar with basic vocabulary of things he uses regularly (food that he eats

regularly for example)." This datum suggests that Miguel's functional ability to read and write was in fact much lower.

40. This IEP also described Miguel as unable to independently communicate with peers or instructors. He was entirely reliant on the teaching assistant for all communication.

41. Therefore, the IEP did not address Miguel's social needs nor consider his opportunity for direct communication with peers.

42. On information and belief, Sturgis briefly paired Miguel with a different teaching assistant in the spring of 2016.

43. On information and belief, this new teaching assistant could communicate in both ASL and Signed English. At first, Miguel and the new teaching assistant could not understand each other because Miguel, in fact, had not learned ASL or Signed English during his time in Sturgis. Therefore, the District's statement that Miguel uses Signed English as his primary mode of communication was false, as Miguel did not know Signed English.

44. The May 2016 IEP does not attempt to attribute lack of progress to any deficiencies in Miguel's attendance or in his desire to learn. As late as 2016, Miguel's IEP continued to describe him as "an extremely hard-working student . . . He is attentive to instruction and desires to learn new things . . . He is self-driven, has a good attitude, and wants to succeed at life."

45. Rather, Miguel's inability to communicate with anybody but the previous teaching assistant is attributable solely to the fact that she had not learned Signed English. On information and belief, she had inadvertently invented a novel sign system that only she and Miguel understood.

9

46.     Over his twelve-year period at Sturgis, the District created many deficient IEPs for Miguel.

47.     The goals written into Miguel's IEPs were much too low to be appropriate for a student who simply is deaf, even if the student did not begin learning language until age nine.

48.     Miguel made minimal to no progress on many of his IEP goals. Many of his progress reports lacked data regarding his progress.

49.     Sturgis failed to provide Miguel with a qualified sign language interpreter at any point during his 12 years at Sturgis.

50.     Sturgis failed to provide Miguel with sufficient exposure to any language to enable him to acquire even basic proficiency in that language, whether it be ASL, Signed English, or English.

51.     Sturgis did not collect and consider sufficient data to determine whether or not Miguel needed extended school year ("ESY") services. Consequently, Sturgis did not provide Miguel with ESY services at any point, despite his severe lack of educational progress.

52.     Sturgis made no attempt to assist Miguel's parents in learning ASL, Signed English, or whatever method the school was using to communicate with him, to ensure that Miguel's exposure to language continued after the school day ended and on weekends. Therefore, over the summer and during school breaks, Miguel had no access to language at all.

53.     Despite repeatedly documenting Miguel's *de minimis* progress, Sturgis made no effort to increase the services for teaching Miguel language or to provide a teaching assistant or interpreter who actually knew ASL or Signed English.

54.     Sturgis assessed Miguel periodically over this twelve-year period and consistently identified Miguel has having a profound hearing loss and no other disability.

10

55.    Therefore, Sturgis knew or should have known that *de minimis* progress in all areas of language development was not appropriate progress for Miguel.

56.    .Sturgis made no reasonable effort to. adjust the education services it provided Miguel in light of his failure to make appropriate progress.

57.    Sturgis also failed to ensure Miguel's parents, Maria Perez and Jose Luna, could exercise their right to participate in educational decisions.

58.    Over the 12-year period that Miguel attended Sturgis, Sturgis provided Spanish-language interpreters of varying ability, including students, so that his parents frequently could not participate in the IEP meetings they attended.

59.    Sturgis failed to provide Ms. Perez or Mr. Luna with a Spanish-language version of the Parental Notice of Procedural Safeguards and failed to otherwise advise them of their procedural rights under the IDEA.

60.    Consequently, Ms. Perez and Mr. Luna did not know about their procedural rights under the IDEA until the Spring of 2016.

61.    Due to their lack of awareness of their procedural rights, Ms. Perez and Mr. Luna were not able to advocate for their son's substantive educational rights.

62.    Due to the grossly inadequate education that Respondents provided to Miguel, he also has not been aware of his own procedural rights and could not advocate for his substantive educational rights.

63.    Sturgis also made inaccurate or misleading representations to Miguel, Ms. Perez. and Mr. Luna regarding the services that Miguel received.

64.    For example, Sturgis told Ms. Perez and Mr. Luna that Miguel was receiving instruction in Signed English and had a teaching assistant who knew Signed English.

65. This information was incorrect. Miguel's teaching assistant did not know Signed English. Indeed, nobody working with Miguel knew Signed English, with the possible exception of the Teacher of the Deaf, who spent at most three hours per week with Miguel.

66. Therefore, Sturgis's representation that Miguel was receiving instruction in Signed English and had a teaching assistant who knew Signed English was inaccurate, misleading, and further prevented Miguel and Miguel's parents from exercising their procedural rights.

67. On information and belief, the Teacher of the Deaf from St. Joseph ISD objected to the IEP and informed Sturgis that the services Sturgis was providing did not ensure that Miguel would receive an appropriate education.

68. Sturgis did not adequately respond to the objections or recommendations from the Teacher of the Deaf.

69. Of its own volition, Respondents never considered or suggested placement at the Michigan School for the Deaf for Miguel.

70. In August 2016, Miguel, through his advocate, requested that Sturgis invite MSD to his IEP team meeting.

71. For the first time in 12 years, Sturgis invited MSD to Miguel's IEP meeting to assist with developing an appropriate program to meet Miguel's needs. The IEP team, for the first time, considered placement at MSD and decided that it was necessary to meet Miguel's needs.

72. MSD serves deaf and hard of hearing students in Michigan. In 1937, the school was placed under the jurisdiction of the State Board of Education, an arrangement that remains in

place to this day.[13]

73.     MSD's mission is to be the leader in educating Deaf and Hard of Hearing children in Michigan, and to provide services to their families and the community.[14]

74.     The Michigan Department of Education and the Michigan Board of Education are responsible for developing, disseminating, and implementing policies and practices that ensure local and intermediate school district are aware of MSD and use MSD as a resource for serving deaf and hard of hearing students, both by consulting with MSD and by inviting MSD to attend IEP meetings for deaf and hard of hearing students.

75.     Sturgis failed to contact MSD prior to 2016, in part due to the Michigan Department of Education and the Michigan Board of Education's failures in developing, disseminating, and implementing policies and practices that ensure local and intermediate school district are aware of MSD and use MSD as a resource for serving deaf and hard of hearing students.

76.     Miguel began attending MSD in the fall of 2016.

77.     Miguel lives on campus in the dormitories at MSD while school is in session going home for weekends and holidays.

78.     At MSD, Miguel is immersed in ASL from the time he wakes up until he goes to bed. He receives instruction in ASL from teachers who have the training and experience to teach ASL, and to teach deaf students with Miguel's unique background. Miguel also has exposure to a variety of peers who use ASL.

79.     Since arriving at MSD, Miguel has made great strides in acquiring ASL, given his severe linguistic deficiencies prior to arriving on campus.

[13] http://www.michiganschoolforthedeaf.org/content/school-history .
[14] http://www.michiganschoolforthedeaf.org/content/visionmissionbeliefs

13

80.    In September 2016, Miguel was evaluated by Dr. Peter K. Isquith, Ph.D., a licensed psychologist with a clinical specialty in working with deaf and hard of hearing individuals. This evaluation revealed the Miguel is not proficient in sign or any other form of communication, describing him as having "very limited language, mostly relying on a collection of atypical and incorrect signs that were not familiar to other students or teachers who sign."

81.    When tested on visual/nonverbal tasks, Miguel demonstrated intellectual functioning within the average range.

82.    Dr. Isquith noted that Miguel demonstrated severe deficits in language, language-related processing, and academic skills. Consistent with his long-standing history of limited language development and teacher observations, Miguel's ability to understand and produce language was very limited. The evaluation also revealed that Miguel reads at a 1st to low 2nd grade level with partial comprehension.

83.    Dr. Isquith also noted that Miguel's language deficit was akin to that seen in individuals who have experienced language deprivation rather than a language disorder per se, which was consistent with his history of limited access to language, secondary to hearing loss.

84.    Miguel's teachers at MSD report that he has made substantial progress in communication over the past year, yet Dr. Isquith stated that Miguel's limited language competence and the impact on his linguistic reasoning, knowledge base and academic skills is permanent. Although Miguel has already shown growth in communication skills since entering MSD, and although this may give him greater access to social information, knowledge about the world and perhaps somewhat better academic skills, those gains are likely to remain small relative to the substantial gap between what he can do and normal expectations.

85.     Dr. Isquith characterized the District's treatment of Miguel as a form of severe neglect, called "linguistic deprivation," which he defined as a neurodevelopmental syndrome stemming from the choices made for children by their educational and medical professionals. He described such neglect as a "pattern of very limited early exposure to an accessible language and chronic absence of a linguistically accessible environment" for most of Miguel's life. Linguistic deprivation is not a disability that a child is born with, but a syndrome caused by the severe educational shortcomings of those responsible for the child's development.

86.     Dr. Isquith described the impact of linguistic deprivation as "varied and far-reaching," associated with numerous long-term cognitive, academic, social and psychiatric risks, along with vocational, educational, and financial consequences.

87.     Given Miguel's cognitive ability and strong work ethic, Dr. Isquith declared that if Sturgis had provided him with necessary accessible language models, he would likely have been able to attend college. Unfortunately, due to the District's neglect and failure to accommodate, this is no longer an option for Miguel. As Sturgis did not provide Miguel with appropriate language exposure or instruction for well over a decade, he will never develop the language fluency or literacy levels needed to pursue higher education.

88.     Currently, Miguel is unable to learn through reading and writing, or even through explanations presented in sign language. He must learn through hands-on training. These deficiencies suggest he will never develop the reading, writing and math skills necessary to enter most vocational or technical programs.

89.     Dr. Isquith explained that Miguel's history of linguistic deprivation at Sturgis also leaves him susceptible to numerous cognitive, social, and psychiatric risks. For example, he is likely to have less satisfying relationships with peers and family, he is at a greater risk for

maltreatment, for emergence of depression and anxiety, for limited academic, vocational, and financial achievement, and for more limited independence as an adult. His work prospects will most likely be limited to unskilled labor.

90.    Miguel requires social work support, which he does not currently receive. The social work support would help him develop and maintain friendships, a skill he has not been able to develop naturally due to the severe isolation he experienced at Sturgis.

91.    Miguel likely will need significant support in vocational rehabilitation and independent living to compensate for the prior deficiencies in his education. Otherwise, it is unlikely that he will develop the skills necessary to obtain employment on his own.

92.    At all times relevant to this Complaint, Sturgis and the Sturgis Board knew they were not providing appropriate educational services to address Miguel's needs. Nevertheless, Sturgis and St. Joseph ISD continued to engage in a practice of failing to provide for Miguel's educational needs.

93.    On information and belief, the District acted according to a policy and widespread practice of failing to provide a FAPE to deaf and hard of hearing students.

94.    The Sturgis Board is responsible for setting policies for the District and therefore is responsible for any injuries that Petitioners sustained.

95.    The Sturgis Board has sufficient powers regarding the hiring, firing, and supervision of Sturgis employees to be held liable for their acts.

96.    An ISD representative consistently attended Miguel's IEP meetings and participated in the acts and omissions alleged in this Complaint.

97.    On information and belief, the ISD acted according to a policy and widespread practice of failing to provide a FAPE to deaf and hard of hearing students.

16

98.     The ISD Board is responsible for setting policies for the ISD and therefore is responsible for any injuries that Petitioners sustained.

99.     The ISD Board has sufficient powers regarding the hiring, firing, and supervision of ISD employees to be held liable for their acts.

100.    Respondents' acts have deprived Miguel of the FAPE he is entitled to by law.

101.    Respondents' acts have deprived Ms. Perez and Mr. Luna of their right to have their child receive a FAPE.

102.    Respondents' acts have deprived the Luna Perez family of their equal opportunity to receive the benefits that other participants in Respondents' programs and services enjoy.

103.    Respondents' acts were knowing and intentional.

104.    Respondents acted in bad faith and/or exercised gross misjudgment.

As a result of Respondents' conduct, the members of the Luna Perez family have experienced severe emotional distress, such as humiliation, frustration, anxiety, sadness, hopelessness, and other forms of mental and emotional anguish.

## V. ALLEGATIONS

### A.    RESPONDENTS VIOLATED THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT, 20 U.S.C. §§ 1400 *et seq.*

105.    Petitioners incorporate by reference all previous paragraphs of the Complaint herein.

#### i.    Respondents Failed to Provide Miguel with a FAPE.

106.    Congress passed the Individuals with Disabilities Education Act ("IDEA") to ensure "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living" and "to

17

ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(1)(A), (B).

107.    The IDEA requires states receiving IDEA funds to have "in effect policies and procedures to ensure that the State meets each of the following conditions": (1) "A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, . . ."[15]; (2) "An individualized education program, or an individualized family service plan that meets the requirements of section 1436(d) of this title, is developed, reviewed, and revised for each child with a disability in accordance with section 1414(d) of this title"; and (3) "Children with disabilities and their parents are afforded the procedural safeguards required by section 1415 of this title," among others. 20 U.S.C. § 1412.

108.    The IDEA requires local education agencies receiving IDEA funding to "submit[] a plan that provides assurances to the State educational agency that . . . . [t]he local educational agency, in providing for the education of children with disabilities within its jurisdiction, has in effect policies, procedures, and programs that are consistent with the State policies and procedures established under section 1412 of this title." 20 U.S.C. § 1413(a).

109.    The IDEA carries additional provisions outlining the substantive and procedural requirements of the Act, including the obligation to evaluate each child and to provide an IEP that ensures the student receives a FAPE in the least restrictive environment able to meet the child's needs, as well as various procedural protections. 20 U.S.C. §§ 1414, 1415.

110.    The District and the Sturgis Board are each a Local Education Agency within the meaning of 20 U.S.C. § 1413 and are thus subject to the IDEA.

---

[15] In Michigan, a FAPE must be provided to students with disabilities through age 26, pursuant to the MARSE. *See* R. 340.1702.

111.    The ISD and the ISD Board participated in the denial of FAPE to Miguel and are thus proper parties to this administrative proceeding per 20 U.S.C. § 1415(b).

112.    At all times relevant to this complaint, Miguel Luna Perez has been a student with a disability under 20 U.S.C. § 1401(3).

113.    At all times relevant to this complaint, Maria Perez and Jose Luna have been the parents of a student with a disability under the IDEA.

114.    Respondents violated the Miguel's rights, Ms. Perez's rights, and Mr. Luna's rights under the IDEA by knowingly failing to provide Miguel with a FAPE and by failing to satisfy certain procedural requirements.

115.    Respondents continue to violate the Miguel's rights, Ms. Perez's rights, and Mr. Luna's rights under the IDEA by knowingly failing to provide Miguel with social work support. Such services are necessary for Miguel to receive a FAPE.

116.    Respondents did not provide the intensive language instruction required in order for Miguel to develop effective communication skills.

117.    Respondents did not provide Miguel with consistent exposure to an accessible mode of language such as ASL.

118.    Respondents did not address Miguel's lack of progress towards the goals in his IEP.

119.    Respondents did not address Miguel's functional needs, such as his need for socialization.

120.    Respondents discontinued speech and language services without any data to support the change.

19

121.    Respondents failed to consider opportunities for direct instruction and direct interaction with peers.

122.    Respondents failed to consider the total continuum of services for students who are deaf or hard of hearing.

123.    Respondents did not provide Miguel with extended school year services nor did it keep data to determine whether extend school year services were necessary.

124.    Respondents failed to provide training and education to Ms. Perez and Mr. Luna.

125.    Respondents otherwise violated Miguel's, Ms. Perez's, and Mr. Luna's right for Miguel to receive a FAPE.

ii.    **Respondents Failed to allow the Parents Meaningful Participation in the Education Process**

126.    Respondents did not provide written materials, including procedural safeguards, to the Parents in a language they could understand.

127.    Respondents misrepresented Miguel's progress to the Parents.

128.    Respondents misrepresented to the Parents the services and supports that it was providing to Miguel.

129.    Respondents otherwise failed to allow the Parents meaningful participation in Miguel's education process.

## B.    RESPONDENTS VIOLATED THE MICHIGAN ADMINISTRATIVE RULES FOR SPECIAL EDUCATION

130.    Petitioners incorporate by reference all previous paragraphs of the Complaint herein.

131.    The Michigan Administrative Rules for Special Education (MARSE), R. 340.1700 *et seq.* set the administrative rules for special education and related services in the state of Michigan.

132.    MARSE defines special education as "specially designed instruction, at no cost to the parents, to meet the unique educational needs of the student with a disability and to develop the student's maximum potential. Special education includes instructional services defined in R 340.1701b(a) and related services." R. 340.1701c(c).

133.    Pursuant to MARSE, "[t]he individualized education program team shall determine the programs and services for a student with a disability in accordance with 34 CFR part 300. The individualized education program shall not be restricted to the programs and services available." R. 340.1721e(4).

134.    Further, "[t]he Michigan school for the deaf shall be considered a part of the total continuum of services for students who are deaf or hard of hearing. The resident district shall conduct the individualized education program team meeting that initiates an assignment into the Michigan school for the deaf. Representatives of the intermediate school district of residence and the Michigan school for the deaf shall be invited to participate in the individualized education program team meeting. R. 340.1721e(5).

135.    Miguel is a student receiving special education services under MARSE.

136.    Jose Luna and Maria Perez are the parents of a child receiving special education services under MARSE.

137.    Respondents are covered entities subject to MARSE.

138.    Respondents failed to provide Miguel with instruction to develop his maximum potential, in violation of MARSE.

139.   Respondents restricted Miguel's individualized education program to the programs and services available, in violation of MARSE.

140.   Respondents failed to consider the Michigan School for the Deaf as part of the total continuum of services for Miguel, in violation of MARSE.

141.   Respondents engaged in additional violations of MARSE with respect to Miguel Luna Perez, Jose Luna and Maria Perez.

C.    **RESPONDENTS VIOLATED SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794**

142.   Petitioners incorporate by reference all previous paragraphs of the Complaint herein.

143.   Pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its regulations, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794.

144.   The regulations regarding Preschool, Elementary, and Secondary Education apply to "preschool, elementary, secondary, and adult education programs or activities that receive Federal financial assistance and to recipients that operate, or that receive Federal financial assistance for the operation of, such programs or activities." 34 C.F.R. § 104.31.

145.   In general, "[a] recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).

146.    Respondents Sturgis and Sturgis Board are recipients of federal financial assistance and operate a public elementary or secondary education program or activity. Therefore, they are covered entities under 29 U.S.C. § 794.

147.    Respondents St. Joseph ISD and the ISD Board are recipient of federal financial assistance and operate public elementary or secondary education programs or activities. Therefore, they are covered entities under 29 U.S.C. § 794.

148.    Miguel Luna Perez is a person with a disability within the meaning of 29 U.S.C. § 794.

149.    Maria Perez and Jose Luna are his parents and are associated with a person with a disability within the meaning of 29 U.S.C. § 794.

150.    Respondents have intentionally discriminated against Miguel Luna Perez, Maria Perez and Jose Luna in violation of Section 504 by failing to provide a FAPE to Miguel Luna Perez.

151.    Respondents have intentionally discriminated against Miguel Luna Perez by failing to provide the auxiliary aids and services needed to ensure effective communication.

152.    Respondents have otherwise intentionally discriminated against Miguel Luna Perez, Maria Perez and Jose Luna in violation of Section 504. As a direct and proximate cause of Respondents' violation of Section 504, Miguel Luna Perez, Maria Perez and Jose Luna have suffered and continue to suffer severe and grievous mental and emotional suffering, humiliation, stigma, and other injuries they will continue to suffer.

**D.    RESPONDENTS VIOLATED TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12131 *et seq.***

153.    Petitioners incorporate by reference all previous paragraphs of the Complaint herein.

23

154.    Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. (*See also* 28 C.F.R. Part 35).

155.    Respondents are each a public entity subject to Title II of the ADA, 42 U.S.C. § 12131.

156.    Miguel Luna Perez is a person with a disability within the meaning of 42 U.S.C. § 12102.

157.    Maria Perez and Jose Luna are his parents and are associated with a person with a disability within the meaning of 42 U.S.C. § 12102.

158.    Respondents intentionally violated Miguel's rights under the ADA and the regulations promulgated here under by excluding him from participation in and denying him the benefits of Respondents' services, programs, and activities, and by subjecting him to discrimination in violation of 42 U.S.C. § 12132.

159.    Respondents have intentionally discriminated against Miguel Luna Perez by failing to provide the auxiliary aids and services necessary to ensure effective communication.

160.    Respondents intentionally discriminated against Maria Perez and Jose Luna based on their association with Jacob Connell, in violation of 42 U.S.C. § 12132.

161.    Respondents otherwise intentionally discriminated against Miguel Luna Perez, Maria Perez and Jose Luna, in violation of 42 U.S.C. § 12132.

162.    As a direct and proximate cause of Respondents' violation of the ADA, Miguel has suffered and continues to suffer severe and grievous mental and emotional suffering, humiliation, stigma, and other injuries he will continue to suffer.

**E.    RESPONDENTS VIOLATED THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT, M.C.L. 37.1101 *et seq.***

163.    Petitioners incorporate by reference all previous paragraphs of the Complaint herein.

164.    The Persons with Disabilities Civil Rights Act ("PDCRA") guarantees, as a civil right, the full and equal utilization of public accommodations, public services, and educational facilities without discrimination because of a disability. M.C.L. 37.1102.

165.    The PDCRA further prohibits educational institutions from "[d]iscriminat[ing] in any manner in the full utilization of or benefit from the institution, or the services provided and rendered by the institution to an individual because of a disability that is unrelated to the individual's ability to utilize and benefit from the institution or its services, or because of the use by an individual of adaptive devices or aids." M.C.L. 37.1402.

166.    Respondents are each an educational facility within the meaning of M.C.L. 37.1102 and an educational institution within the meaning of M.C.L. 37.1401.

167.    Miguel has a disability as defined in M.C.L.A. 37.1103.

168.    Miguel's disability is unrelated to his ability to utilize and benefit from Respondents' services.

169.    Respondents discriminated against Miguel in the full utilization of or benefit from the services provided and rendered by Respondents due to Miguel's disability.

170.    Respondents otherwise violated Miguel's rights under the PDCRA.

**VI. PRAYER FOR RELIEF**

WHEREFORE, Petitioners request the following relief:

A.    Find that Respondents violated state and federal law;

B.    Order compensatory education for Miguel Luna Perez;

25

C.   Order related services, such as social work services, for Miguel Luna Perez;

D.   Order compensatory family support services for Jose Luna and Maria Perez;

E.   Enjoin the Respondents from implementing all policies and practices that violate or have the effect of violating the federal protected rights of Petitioner;

F.   Find that Petitioners are the prevailing·party;

G.   Award Petitioners compensatory damages;

H.   Award Petitioners their reasonable attorneys fees and costs under 42 U.S.C. § 1988 and/or other applicable statues; and

I.   Any other relief deemed necessary.

Respectfully submitted,

Dated: 10/5/17          By: Miguel Luna Perez
                             Miguel Luna Perez
                             Petitioner

Dated: 10/15/17         By: ma Angela Perez
                             Maria Perez
                             Petitioner

Dated: 10/5/17          By: JOSE JAVIER LUNA RAMIREZ
                             Jose Luna
                             Petitioner

26

## STATEMENT OF DELIVERY

A copy of this Due Process Complaint was sent to the following individuals by U.S. First Class Mail:

Addressed To:

Michigan Department of Education
608 W. Allegan Street
P.O. Box 30008
Lansing, MI  48909

Sturgis Public Schools
Attn: Superintendent Thomas Langdon
107 W. West Street
Sturgis, MI 49091

Sturgis Public Schools Board of Education
107 W. West Street
Sturgis, MI 49091

St. Joseph Intermediate School District
Attn: Superintendent Teresa Belote
62445 Shimmel Road
Centreville, MI 49032

St. Joseph ISD Board of Education
62445 Shimmel Road
Centreville, MI 49032

Date Mailed:  December 26, 2017

Mailed by:


Susan E. Pitts
Printed Name

Signature