**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Deborah S. Hunt                  POTTER STEWART U.S. COURTHOUSE                  Tel. (513) 564-7000
Clerk                            CINCINNATI, OHIO 45202-3988                     www.ca6.uscourts.gov

Filed:  June 25, 2021

Mr. Kenneth Bennett Chapie
Giarmarco, Mullins & Horton
101 W. Big Beaver Road, Tenth Floor
Troy, MI 48084

Catherine Merino Reisman
Reisman Carolla Gran
19 Chestnut Street
Haddonfield, NJ 19130

Ms. Ellen Marjorie Saideman
7 Henry Drive
Barrington, RI 02806

Mr. Mitchell Sickon
Disability Rights Michigan
4095 Legacy Parkway, Suite 500
Lansing, MI 48911

                Re:  Case No. 20-1076, *Miguel Perez v. Sturgis Public Schools, et al*
                     Originating Case No. : 1:18-cv-01134

Dear Counsel,

    The Court issued the enclosed opinion today in this case.

                              Sincerely yours,

                              s/Cathryn Lovely
                              Opinions Deputy

cc:  Mr. Thomas Dorwin

Enclosure

Mandate to issue

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0140p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

MIGUEL LUNA PEREZ,

*Plaintiff-Appellant*,

*v.*

No. 20-1076

STURGIS PUBLIC SCHOOLS; STURGIS PUBLIC SCHOOLS
BOARD OF EDUCATION,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cv-01134—Paul Lewis Maloney, District Judge.

Argued:  October 9, 2020

Decided and Filed:  June 25, 2021

Before:  BOGGS, STRANCH, and THAPAR, Circuit Judges.

———————————

### COUNSEL

**ARGUED:**  Ellen Saideman, LAW OFFICE OF ELLEN SAIDEMAN, Barrington, Rhode Island, for Appellant.  Kenneth B. Chapie, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees.  **ON BRIEF:**  Ellen Saideman, LAW OFFICE OF ELLEN SAIDEMAN, Barrington, Rhode Island, Mitchell Sickon, MIGHIGAN PROTECTION AND ADVOCACY SERVICE, INC., Lansing, Michigan, for Appellant.  Kenneth B. Chapie, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees.  Catherine Merino Reisman, REISMAN CAROLLA GRAN & ZUBA LLP, Haddonfield, New Jersey, for Amicus Curiae.

THAPAR, J., delivered the opinion of the court in which BOGGS, J., joined. STRANCH, J. (pp. 12–25), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

THAPAR, Circuit Judge.  Miguel Perez claims that his school district failed to provide him with an appropriate education.  He brought his claim in the proper administrative forum, but he settled with the school before the process had run its course.  Under the Individuals with Disabilities Education Act, the decision to settle means that Perez is barred from bringing a similar case against the school in court—even under a different federal law.  The district court dismissed the case, and we affirm.

### I.

Miguel Perez is a 23-year-old deaf student in Michigan.  When he was nine, he emigrated from Mexico and started going to school in the Sturgis Public School District.  Since Perez is deaf, the school assigned him a classroom aide—but the aide was not trained to work with deaf students and did not know sign language.

Still, Perez appeared to progress academically.  His teachers gave him As or Bs in nearly every class, and he was on the Honor Roll every semester.  So Perez and his parents assumed he was on track to earn a high-school diploma.  But just months before graduation, the school informed the family that Perez did not qualify for a diploma—he was eligible for only a "certificate of completion."

Perez filed a complaint with the Michigan Department of Education.  He alleged that Sturgis denied him an adequate education and violated federal and state disability laws: the Individuals with Disabilities Education Act (IDEA), the Americans with Disabilities Act (ADA), the Rehabilitation Act, and two Michigan disabilities laws.  The school moved to dismiss the ADA claims and the Rehabilitation Act claims, and one state-law claim for lack of jurisdiction. The administrative law judge granted the motion and scheduled a hearing on the IDEA claim.

Before the hearing, the parties settled.  As part of the settlement, the school agreed to pay for Perez to attend the Michigan School for the Deaf, for any "post-secondary compensatory

education," and for sign language instruction for Perez and his family.  It also paid the family's attorney's fees.  The ALJ dismissed the case with prejudice.

A few months later, Perez sued Sturgis Public Schools and the Sturgis Board of Education in federal court.  He brought one ADA claim and one claim under Michigan law.  This time, Perez alleged that the school discriminated against him by not providing the resources necessary for him to fully participate in class.  Along with declaratory relief, Perez sought compensatory damages for his emotional distress.

Sturgis moved to dismiss the case.  It said that the IDEA required Perez to complete certain administrative procedures before bringing an ADA claim.  And it argued that because Perez did not follow those procedures—Perez settled his IDEA claim before it was adjudicated—the IDEA barred Perez's suit.  The district court agreed.  It dismissed the ADA claim for failure to exhaust and declined to exercise supplemental jurisdiction over the remaining state-law claim.  Perez appealed.

II.

A.

Under the Individuals with Disabilities Education Act, children with disabilities have a right to a "free appropriate public education" (FAPE).  20 U.S.C. § 1412(a)(1).  To that end, public schools must provide educational services tailored to disabled children's individual needs. *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993, 999 (2017).

Sometimes a school falls short.  When that happens, parents can seek redress through the IDEA.  The IDEA encourages informal conflict resolution, but it provides for increasingly formal mechanisms if a disagreement persists.  First, the parents file a complaint with the school and meet with school officials.  If the parties can't agree, either party can request mediation. Finally, if that doesn't work, the parents are entitled to a full hearing before an impartial "hearing officer."  20 U.S.C. § 1415(b)–(f).  The hearing officer's job is to decide whether the student is receiving a "free appropriate public education."  *Id.* § 1415(f)(3)(E).  Either the state or the local

school district can conduct the hearing. In the latter case, the losing party may appeal the ruling to the state. *Id.* § 1415(f)(1)(A), (g).

Once the state has had its say, the administrative process is over. There remains one last option for aggrieved parents: a lawsuit in federal or state court. 20 U.S.C. § 1415(i)(2)(A).

Some parents would rather not trudge through an administrative process before coming to court. But federal law requires parents to complete the IDEA's administrative process before bringing any suit under federal law that concerns the "denial of a free appropriate public education." This requirement includes even parents who forgo their IDEA claims and sue under another statute: Parents must first "exhaust[]" the IDEA's administrative procedures "to the same extent as would be required had the action been brought under [the IDEA]." 20 U.S.C. § 1415(*l*).

That may seem strange—since when do we graft exhaustion requirements from one law onto another? We usually don't. But the provision is not a conventional exhaustion requirement: It doesn't require Perez to exhaust his *ADA* claim before bringing it to court. Instead, it requires him to exhaust his corresponding *IDEA* claim. So Perez can sue under "other [f]ederal laws protecting the rights of children with disabilities"—including the ADA—but he must first complete the IDEA's full administrative process. 20 U.S.C. § 1415(*l*). If he gives up his IDEA claim, he also gives up his right to "seek[] relief for the denial of an appropriate education" under other federal laws. *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017).

So what does this mean for Perez? He did not forgo his IDEA claim altogether, but he settled it before completing the administrative process. (And the negotiations for that settlement could have included compensation for the loss of his other claims.) Does this failure bar his current lawsuit? That depends on three questions: Is his case subject to the IDEA's exhaustion provision? If so, has Perez exhausted the IDEA's administrative procedures to the extent necessary? And if he has not, should we allow his suit to proceed anyway?

B.

Any lawsuit is subject to the IDEA's exhaustion provision if it "seek[s] relief that is also available under [the IDEA]."  20 U.S.C. § 1415(*l*).  When interpreting that provision, the Supreme Court has told us to look beyond the surface of the pleadings and ask:  Is the crux of the complaint the denial of a free appropriate public education?  *Fry*, 137 S. Ct. at 755; *id.* at 757 (describing the key as whether the complaint's "essence—even though not its wording—is the provision of a [free appropriate public education]").  If so, the exhaustion requirement should apply.

1.

The crux of Perez's complaint is that he was denied an adequate education.  Perez says that the school's failures denied him "meaningful access to the classroom or any other Sturgis activities," kept him from "access[ing] his education," and kept him from "participat[ing] and benefit[ting] from classroom instruction."  R. 10, Pg. ID 115–19.  He also says the school "misrepresented [his] academic achievement" by awarding him grades that "did not in any way reflect the education he was receiving."  *Id.* at 119.  Those grades, he says, "masked the fact that [he] was learning nothing in his classes due to the absence of a qualified sign language interpreter."  *Id.*  All the while, "[Perez] and his parents believed that [he] had been receiving meaningful communication access to his classes," such that he would "graduat[e] with a regular high school diploma in . . . 2016 and [go] to college thereafter."  *Id.* at 120.  But it wasn't true.  And Perez was understandably distressed to learn that he was years behind where he should have been.  In short, Perez alleges that the school denied him an appropriate education and papered over the deficiencies.

*Fry* offers two questions as a "clue" when it is hard to determine whether a claim is fundamentally about the denial of an education.  The two questions are:  Could the plaintiff have brought "essentially the same claim" against a different kind of public facility, like a public theater or a library?  *Fry*, 137 S. Ct. at 756–57.  And could an adult at the school, like an employee or a visitor, have "pressed essentially the same grievance"?  *Id.*

Here, the answer to both questions is no.  As the complaint says, Perez and his parents believed that he *was* receiving "meaningful communication access to his classes."  R. 10, Pg. ID 120.  The problem is that—unbeknownst to him—his *education* wasn't up to snuff.  He thought he was progressing adequately and would graduate on time.  But because the school failed to provide him with the educational services he needed, he was not.  Given that everything in Perez's complaint points to a "focus on the adequacy of [his] education," he could not bring essentially the same claim against a facility that had no responsibility to educate him and no opportunity to conceal his lack of progress.  *Fry*, 137 S. Ct. at 758.  Nor could an adult at the school press the same grievance as Perez—the school would have no obligation to provide services necessary for the adult to progress at an appropriate educational pace.  So under *Fry*, it's clear that Perez seeks relief for the school's failure to meet its IDEA obligations.

2.

Although Perez now seeks relief for the denial of a FAPE, he requests a specific remedy that is unavailable under the IDEA:  compensatory damages for emotional distress.  Recall that the exhaustion provision applies only to actions "seeking relief that is also available under [the IDEA]."  20 U.S.C. § 1415(*l*).  So does his choice of remedy make a difference?

Our circuit has said no:  A lawsuit that seeks relief for the denial of an appropriate education is subject to section 1415(*l*), even if it requests a remedy the IDEA does not allow.  *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 916–17 (6th Cir. 2000).  Most other circuits agree.  *See id.* (collecting cases); *McMillen v. New Caney Indep. Sch. Dist.*, 939 F.3d 640, 647–48 (5th Cir. 2019).

This reading makes sense.  The key is how to understand the word "relief."  At the most basic level, we say that people come to court for relief when they have been wronged.  The court's goal is to rectify that wrong—to provide relief.  Perez seeks relief for the denial of an appropriate education.  The IDEA provides relief for the denial of an appropriate education.  Since Perez seeks relief for the wrong that the IDEA was enacted to address, he seeks "relief that is also available under [the IDEA]."  20 U.S.C. § 1415(*l*).  That's true even though Perez wants a remedy he cannot get.  "'Relief available' under the IDEA [means] relief for the events,

condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers." *McMillen*, 939 F.3d at 648.

Although the Supreme Court has declined to answer this question, its reasoning in *Fry* supports this understanding of "relief." When the Court interpreted the phrase "seeking relief that is also available under [the IDEA]," it explained that the main consideration is the nature of the grievance: If the harm is the denial of the public education, then the lawsuit falls within the scope of section 1415(*l*). *Fry*, 137 S. Ct. at 754. The focus of the analysis is not the kind of relief the plaintiff wants, but the kind of harm he wants relief from. We thus agree that *Fry*'s analysis "comports with reading 'relief' to focus on the conduct the plaintiff complains about." *McMillen*, 939 F.3d at 648. And under that reading, the plaintiff's choice of remedy is irrelevant.

Thus, Perez's case is subject to the IDEA's exhaustion requirements. His core complaint is that the school denied him an appropriate education, so his suit "seek[s] relief that is also available under [the IDEA]."

## C.

Since Perez's lawsuit is subject to the IDEA's requirements, the next question is whether Perez satisfied those requirements. Because he settled his IDEA claim rather than continue to litigate it in the administrative forum, he did not.

The provision affecting Perez's *ADA* claim requires that a plaintiff exhaust the *IDEA's* administrative procedures "*to the same extent* as would be required had the [court] action been brought under [the IDEA]." 20 U.S.C. § 1415(*l*) (emphasis added). That means Perez can sue under the ADA only if he could also bring an IDEA action in court. *A.F. ex rel. Christine B. v. Espanola Pub. Schs.*, 801 F.3d 1245, 1248 (10th Cir. 2015) (Gorsuch, J.). If Perez has not taken the steps necessary to bring an IDEA claim in court, his ADA claim must fail.

An IDEA plaintiff cannot come to court until a state determines that the student has not been denied a free appropriate public education. Then, and only then, is a plaintiff "aggrieved by the findings and decision rendered" and eligible to sue. 20 U.S.C. § 1415(g)(1), (i)(2)(A). But if

an administrative officer has conducted no hearings, made no findings, and issued no decisions, there is nothing to be aggrieved by.

Michigan never determined whether Perez received an appropriate education under the IDEA.  The Michigan Department of Education had set a hearing date for Perez's IDEA case, but the school offered to settle before the hearing took place.  And Perez's parents accepted the settlement offer.  That decision involved tradeoffs:  The school district agreed to pay for Perez to attend the Michigan School for the Deaf, for other compensatory education, and for sign language instruction for the family.  But the settlement also meant that Perez's parents had to dismiss his complaint, which meant that he could never file the IDEA claim or any other corresponding statutory claim in court.  Perez did not exhaust the IDEA's procedures as is needed to bring an IDEA action.  To pursue his ADA claim, that is what he had to do.

D.

Perez contends that the court should excuse his failure to exhaust the IDEA's procedures before filing his ADA claim.  He makes two arguments:  First, exhaustion of the IDEA claim would have been futile because the administrative process could not provide damages for his emotional distress (and he had "obtained all the educational relief the IDEA [could] provide him" when he settled his claim).  Appellant Br. at 26.  Second, judicial estoppel prevents the defendants from invoking the exhaustion requirement.  Neither argument is persuasive.

Section 1415(*l*) does not come with a "futility" exception, and the Supreme Court has instructed us not to create exceptions to statutory exhaustion requirements.  *See Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016) (explaining that only "judge-made exhaustion doctrines . . . remain amenable to judge-made exceptions").  Perez and the dissent cite *Honig v. Doe* for the contrary position, but that case does not support their argument.  484 U.S. 305 (1988).  In *Honig*, the Supreme Court interpreted a provision of the IDEA's precursor statute that required schools to keep disabled children in their normal classroom placements while the administrative proceedings ran their course.  *Id.* at 323–25.  The Court held that the rule did not contain an "emergency exception for dangerous students."  *Id.* at 325.  Then, addressing the school's policy concerns, the Court stated that it saw "no reason to believe" that schools couldn't try to

"demonstrate the futility or inadequacy of administrative review" in some situations.  *Id.* at 327 (acknowledging that the Court "ha[d] previously noted [that] parents may bypass the administrative process where exhaustion would be futile or inadequate" (citing *Smith v. Robinson*, 468 U.S. 992, 1014 n.17 (1984))).  But this dictum about the policy consequences for schools struggling to accommodate dangerous students does not help Perez.  Nor did *Smith v. Robinson*, to which *Honig* alluded, announce a futility exception to the exhaustion requirement in section 1415(*l*).  *See* 468 U.S. at 1014 n.17.  It could not, because the requirement did not exist at the time.  *See Fry*, 137 S. Ct. at 750 (explaining that Congress responded to *Smith* by passing the Handicapped Children's Protection Act of 1986, "overturn[ing] *Smith*'s preclusion of non-IDEA claims while also adding a carefully defined exhaustion requirement").  At best, *Smith* acknowledged that some lower courts had assumed that a futility exception would be available to those pursuing claims under the IDEA's precursor statute.  *See* 468 U.S. at 1014 n.17.

Even assuming that a general futility exception exists for IDEA claims, it would be of no use to Perez.  Perez seeks an extended futility exception that could only apply to plaintiffs seeking different remedies under different federal statutes.  This proposed exception—beyond anything *Honig* or *Smith* might have recognized—is incompatible with the text of section 1415(*l*).  As we have explained, section 1415(*l*) requires exhaustion of the IDEA's procedures "*to the same extent* as would be required had the [court] action been brought under [the IDEA]."  20 U.S.C. § 1415(*l*) (emphasis added); *see supra* Part II.C.  That means that a court cannot hear a plaintiff's ADA claim if it would have to dismiss that plaintiff's IDEA claim for failure to exhaust.  *See A.F.*, 801 F.3d at 1248.  And Perez's basis for futility—the administrative process's inability to award damages for emotional distress—would never allow a court to excuse the failure to exhaust an IDEA claim.  "One exhausts processes, not forms of relief."  *Booth v. Churner*, 532 U.S. 731, 739 (2001) (cleaned up).  As Perez's argument could not save an unexhausted IDEA claim, neither can it save an ADA claim under section 1415(*l*).[*]

---

[*]The dissent argues that Sixth Circuit precedent has extended *Honig* and recognized a futility exception to section 1415(*l*).  Dissenting Op. at 18 (citing *Covington*, 205 F.3d at 917–18).  It is true that in *Covington*, we said that a plaintiff's § 1983 claims for physically abusive treatment of a disabled student could proceed, notwithstanding the plaintiff's failure to exhaust the IDEA's administrative process.  We "express[ed] no opinion as to whether [the] complaint [fell] within the ambit of the IDEA," but we concluded that exhaustion was futile because the "administrative process would be incapable of imparting appropriate relief."  205 F.3d at 916–18.  "But we do not

That conclusion is required by the text of section 1415(*l*), and it is the only one compatible with the structure of the statute.  When a plaintiff seeks relief for the denial of a FAPE, the ALJ's inability to award money damages cannot be a source of futility.  Given section 1415(*l*)'s focus on exhaustion of the IDEA's "procedures," we know that "Congress meant to require procedural exhaustion regardless of the fit between [Perez's] prayer for relief and the administrative remedies possible."  *Id.*; *see* 20 U.S.C. § 1415(*l*).  But if a request for damages could excuse the failure to exhaust, then any student seeking money damages could skip the administrative process.  Section 1415(*l*) would have no force.

The IDEA's administrative process was capable of providing Perez *relief* for his denial of a FAPE, even if not the specific *remedy* he might have wanted.  True, Perez settled his claim before allowing the process to run its course.  But when an available administrative process could have provided relief, it is not futile, even if the plaintiff decides not to take advantage of it. *Cf. Sango v. LeClaire*, No. 16-2221, 2017 WL 3912618, at *2 (6th Cir. 2017) (explaining, in the context of the Prison Litigation Reform Act, that a "prisoner cannot abandon the [administrative] process before completion and argue that he has exhausted his remedies or that it is futile for him to do so because his grievance is now time-barred under the regulations").  Thus, we cannot excuse Perez's failure to exhaust on the basis of futility.

Additionally, exhaustion would not have been an empty bureaucratic exercise for Perez. The development of an administrative record would have improved the accuracy and efficiency of judicial proceedings, especially because the ALJs have experience with special-education cases.  *See Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 935 (6th Cir. 1989) (explaining that one advantage of the exhaustion requirement is that "[f]ederal courts—generalists with no expertise in the educational needs of handicapped students—are given the benefit of expert factfinding by a state agency devoted to this very purpose").  And the ALJ could have made findings supporting Perez's version of the facts, which would have

---

adhere to published precedent when an intervening decision of the United States Supreme Court requires modification of our prior decision."  *United States v. King*, 853 F.3d 267, 274 (6th Cir. 2017) (cleaned up).  Any futility exception to section 1415(*l*) recognized in *Covington* cannot survive *Ross*, which prohibits judge-made exceptions to statutory exhaustion requirements.  136 S. Ct. at 1857.

certainly aided Perez's follow-on suit under the ADA.   In other words, the exhaustion requirement would have worked just as it is supposed to.

Finally, Perez argues that we should estop the school from holding him to the IDEA's requirements.  Judicial estoppel applies only when a party tries to take a position that is "clearly inconsistent" with an earlier one.  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).  Recall that when Perez first filed his IDEA complaint in the administrative forum, he tacked on an ADA claim as well.  The defendants successfully moved to dismiss the ADA claim for lack of jurisdiction—the administrative forum was available only for IDEA claims.  Perez says that this dismissal made "exhaustion of his ADA claim impossible."  Reply Br. at 25.  But exhaustion of the *IDEA claim* was possible, and that is what section 1415(*l*) requires.  Perez does not dispute that he would have satisfied the requirement had he continued to litigate his IDEA claim.  There is no inconsistency in the defendants' position:  Their motion to dismiss did not hinder Perez from bringing the ADA claim in court after exhausting the IDEA's procedures.  There is thus no basis to apply judicial estoppel.

* * *

Because Perez failed to satisfy the IDEA's exhaustion provision in section 1415(*l*), his ADA claim is barred.  We affirm.

————————————

## DISSENT

————————————

JANE B. STRANCH, Circuit Judge, dissenting.  In *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017), the Supreme Court handed lower courts the framework for evaluating whether a plaintiff seeks relief that is available under the IDEA and therefore must exhaust the IDEA's remedies under 20 U.S.C. § 1415(l).  Analyzed within that framework, Miguel Perez's ADA complaint—read in his favor, as we must on a motion to dismiss—plainly does not seek IDEA relief, which entitles Perez to proceed with his claims.  To reach the opposite conclusion, the majority disfigures Perez's allegations, ignoring the Supreme Court's express mandate to treat a plaintiff as "master" of his own claim.  *Fry*, 137 S. Ct. at 755.  The result undermines Congress's stated intent in passing § 1415(l): to reaffirm the viability of the federal anti-discrimination statutes and the IDEA as *separate* vehicles for protecting the rights of children with disabilities.  *See id.* at 750.  And even if we assume that Perez's suit qualifies as a claim seeking relief available under the IDEA, under binding Supreme Court and Sixth Circuit precedent he has adequately pled that he is excused from exhausting his remedies because it would be futile.  I therefore respectfully dissent.

### A.  Legal Framework

As the majority explains, every child with disabilities has the right to a FAPE: instruction tailored to meet a child's individual needs, along with supportive services sufficient to enable that child to benefit from his or her education.  *Id.* at 748–49 (citing 20 U.S.C. § 1401(9), (26), (29) and *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 485 U.S. 176, 198 (1982)).  In contrast, Title II of the ADA protects the right of disabled people to access public programs and services, mandating that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Before the passage of Title II, the Rehabilitation Act of 1973 and 42 U.S.C. § 1983, alongside the Education for the Handicapped Act—as the IDEA was previously known— ostensibly provided the statutory remedies for disability-based discrimination by government entities. *See Smith v. Robinson*, 468 U.S. 992, 1016–1018 (1984). But in 1984, in *Smith*, the Supreme Court concluded that the EHA was the "exclusive avenue" through which a child with disabilities could challenge the adequacy of his education. *Fry*, 137 S. Ct. at 750 (citing *Smith*, 468 U.S. at 1009). Congress quickly overturned that holding by enacting § 1415(l), which, *Fry* explains, "'reaffirm[ed] the viability' of federal statutes like the ADA or the Rehabilitation Act 'as separate vehicles,' no less integral than the IDEA, 'for ensuring the rights of handicapped children,'" while also "impos[ing] a limit on that 'anything goes' regime, in the form of an exhaustion provision." *Id.* (quoting H.R. Rep. No. 99–296, p. 4 (1985)).

That "exhaustion requirement" applies when a suit "seek[s] relief that is also available" under the IDEA. *Id.* at 752 (quoting § 1415(l)). And a suit seeks relief available under the IDEA when it seeks relief for the denial of a FAPE, a free appropriate public education. *Id.* The court is to look to the "substance, or gravamen" of the complaint, not the labels used, to make this determination. *Id.* at 752, 755. In our legal system—including in disability complaints—the plaintiff is the "master of the claim," and the central question for the court is whether the complaint *actually seeks* relief available under the IDEA, not whether it *could have sought* such relief. *Id.* at 755. Two hypothetical questions may provide clues about the true nature of a given claim.

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so . . . .

*Id.* at 756. The same conduct might, of course, violate the IDEA as well as other statutes. *Id.* But the purpose of the questions is not to determine whether a plaintiff could have proceeded only under another statute. *Id.* at 757 n.10. Rather, they ask whether "a plaintiff who has chosen

to bring a claim under Title II . . . instead of the IDEA—and whose complaint makes no mention of a FAPE—nevertheless raises a claim whose *substance* is the denial of an appropriate education.  *Id.*  Courts should also consider the "diverse means and ends" of the relevant statutes, as well as the history of the proceedings in the case at bar.  *Id.* at 755, 757.

## B.  The Gravamen of Perez's Complaint

In his complaint, Perez alleges that Defendants assigned him an unqualified interpreter—Gayle Cunningham, who did not know any form of sign language—to be his sole facilitator of communication, failed to properly evaluate her interpreting ability, and misrepresented to him and his family that she was qualified.  And because Cunningham was not qualified and did not know any form of sign language, she was unable to effectively interpret for Perez the English that was spoken around him at school.  At that time, Perez did not realize that Cunningham's interpretation was inaccurate, because he had no way of independently understanding what was actually being said.  Perez was also excluded from the English Language Learner program and from Sturgis's extracurricular activities because he was deaf.  Beginning in 2015, Cunningham was given duties away from Perez for several hours a day, leaving him without any means of communicating with others.  As a result of Defendants' multiple failures, Perez alleges, he was deprived of effective "communication access" to "ELL services, teachers, classroom instruction, and extra-curricular activities," simply because he is deaf.

The majority opinion decides that the "crux of Perez's complaint is that he was denied an adequate education," and so his claim is subject to exhaustion.  Maj. Op. at 5.  In response to the *Fry* questions, the majority concludes that Perez could not bring such a claim against another facility, nor could an adult against the school, because in neither case would the defendant have a responsibility to provide the services necessary to educate the plaintiff.  *Id.* at 5–6.

That reasoning mischaracterizes the complaint and draws inferences against Perez, which we may not do on a motion to dismiss.  *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440, 451 (6th Cir. 2020).  As illustrated by his allegations, Perez takes issue not with Defendants' failure to provide tailored educational services, but with their failure to provide appropriate *interpretation* services, which prevented him from understanding and

communicating with anyone there—teachers, classmates, coaches, cafeteria workers, etc.  That is a classic ADA claim; courts regularly entertain claims by deaf and hard-of-hearing people against a wide range of institutions for failing to provide them with an effective form of interpretation.  *See, e.g.*, *Popovich v. Cuyahoga Cnty. Ct. of Common Pleas, Domestic Rels. Div.*, 276 F.3d 808, 816–18 (6th Cir. 2002) (reversing grant of summary judgment on Title II claim based on court system's failure to provide closed-captioning or real time transcription services to litigant in custody dispute); *Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1134–35 (11th Cir. 2018) (reversing grant of summary judgment on Title III claim on hospital that had denied plaintiff's request for an ASL interpreter); *McGann v. Cinemark USA, Inc.*, 873 F.3d 218, 230 (3d Cir. 2017) (finding that movie theater's refusal to provide deaf individual with requested "tactile interpreter" was violation of Title III of the ADA); *Argenyi v. Creighton Univ.*, 703 F. 3d 441, 446–51 (8th Cir. 2013) (finding that there were issues of fact as to medical student's effective communication claim under Title III based on medical school's refusal to provide him with the auxiliary aids he requested as accommodations); *Rothschild v. Grottenthaler*, 907 F.2d 286, 292–93 (2d Cir. 1990) (holding that the Rehabilitation Act required public school district to provide sign language interpreters to student's deaf parents).

So for Perez's claim, the answer to both *Fry* questions is yes.  And because his claim is at core about access, it closely resembles the prototypical claim of "simple discrimination" described in *Fry*—the suit by a wheelchair-bound child against a school without ramps—as distinct from a claim for denial of a FAPE.  Just as that child is physically excluded from accessing the classrooms of his school, so too Perez alleges he was excluded from the programs and services of his school.  That kind of exclusion is precisely the type of harm the ADA seeks to remedy.  *See* 42 U.S.C. §§ 12101(a)(2) (finding that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem").  Of course, because Perez is a former student suing his school, the absence of a qualified interpreter necessarily had "educational consequences," as would a lack of ramps barring a student from entering the classroom, but the fact that "the claim can stay the same in . . . alternative scenarios suggests that its essence is equality of access to public facilities, not adequacy of special education."  *Fry*, 137 S. Ct. at 756.  As *Fry* explains, Perez "might

well . . . be[] able to proceed under both" the ADA and the IDEA, but that does not make his claim subject to the exhaustion requirement if its substance is not the denial of a FAPE.  137 S. Ct. at 757 n.10; *see also Sophie G. by and through Kelly G. v. Wilson Cnty. Schs.*, 742 F. App'x 73, 78 –79 (6th Cir. 2018) (concluding plaintiff did not need to exhaust her remedies on ADA claim challenging public childcare program's denial of access to child with autism and developmental delays because she was not toilet trained).

Consider, by contrast, *Fry's* example of a prototypical claim that does concern denial of a FAPE:  a Title II suit by a student with a learning disability against his school for failing to provide him with remedial tutoring in math.  137 S. Ct. 756–57.  Although that suit could be cast as one for disability-based discrimination, the essence of the claim is that the student was deprived of educational services, and "[t]he difficulty of transplanting the complaint to . . . other contexts suggests that its essence . . . is the provision of a FAPE."  *Id.*; *see also L.G. by & through G.G. v. Bd. of Educ. of Fayette Cnty., Ky.*, 775 F. App'x 227, 231 (6th Cir. 2019) (holding that suit was for denial of a FAPE where student had been unable to attend school due to an *e. coli* infection and complained that the local board of education failed to "assist" with his "academic needs" failed to "locate and provide educational services for him," filed a truancy petition against him, and gave him failing grades).

While a complaint about a school's failure to provide the educational services a student needs is indeed subject to the exhaustion requirement, *see* Maj. Op. at 6, Perez's complaint is not because that is not what he alleges.  And by misconstruing Perez's allegations of simple discrimination in an educational context, the majority opinion replicates the errors of our Circuit's pre-*Fry* approach.  In *Fry*, the Supreme Court observed that the Sixth Circuit panel below had incorrectly "asked whether E.F.'s injuries were, broadly speaking, 'educational' in nature," which "is not the same as asking whether the gravamen of E.F.'s complaint charges, and seeks relief for, the denial of a FAPE."  *Id.* at 757–58.  The Court also cited approvingly to *Payne v. Peninsula School Dist.*, 653 F.3d 863, 874 (9th Cir. 2011) (en banc), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014), which "criticized an approach similar to the Sixth Circuit's for 'treat[ing] § 1415(*l*) as a quasi-preemption provision, requiring administrative exhaustion for any case that falls within the general 'field' of educating disabled

students." *Fry*, 137 S. Ct. at 752 n.3 (quoting *id.,* at 875). The majority's focus today on the fact that Perez's factual allegations are about his education, and its disregard of what it is he "charges, and seeks relief for," impermissibly revives our prior error. *See id.* at 758. More broadly, it robs Perez, and other disabled students like him, of their ability to vindicate their independent right to damages under the ADA, undermining Congress's purpose in passing § 1415(l)—to "'reaffirm[] the viability' of federal statutes like the ADA . . . 'as separate vehicles,' no less integral than the IDEA, 'for ensuring the rights of handicapped children.'" *Id.* at 750 (quoting H.R. Rep. No. 99–296, p. 4 (1985)).

The majority also disregards the second clue provided in *Fry*: the history of the proceedings. A plaintiff's initial pursuit of administrative procedures prior to switching to a judicial forum before full exhaustion could "suggest that she is indeed seeking relief for the denial of a FAPE—with the shift . . . reflecting . . . strategic calculations about how to maximize the prospects of such a remedy." *Fry,* 137 S. Ct. at 757. Or it might reflect "a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else entirely." *Id.* Which of these interpretations is true "depends on the facts." *Id.* In *Fry*, decided on a Rule 12 motion to dismiss, the Court concluded that the record was "cloudy" as to those facts, and so remanded for further factual development. *Id.* at 758.

The record is just as "cloudy" here. *Id.* While Perez did initiate an administrative proceeding for denial of a FAPE and obtained a settlement, the portion of his due process complaint that addresses that earlier FAPE claim sets forth an entirely different set of violations and injuries. Perez alleged in that proceeding that Defendants violated his right to a FAPE by: failing to provide him with sufficient educational and supportive services, like social work support and intensive language instruction; failing to address his lack of progress toward his IEP's goals; failing to address his functional need for socialization; discontinuing his speech and language services; failing to provide extended school year services; failing to provide training and education to his parents; failing to meaningfully involve his parents in the education process, and more. Read in the light most favorable to Perez, the federal complaint plausibly suggests that Perez's decision to bring a different claim here than he did before the ALJ reflects an awareness "that the school had fulfilled its FAPE obligation" and an intention to seek redress for

"something else entirely."  *Id.*  So, like the Supreme Court in *Fry*, I would reverse the district court's judgment and remand for further proceedings.

### C.  The Futility and Inadequacy Exceptions

Even if Perez's complaint sought relief for the denial of a FAPE, binding circuit and Supreme Court precedent compels the conclusion that Perez has plausibly alleged that he should be excused from the exhaustion requirement.

A request for money damages for emotional distress does not, on its own, allow a plaintiff to evade the exhaustion requirement.  *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 916–17 (6th Cir. 2000), *amended on denial of reh'g* (May 2, 2000).  But we have held that exhaustion can be waived as futile or inadequate where a plaintiff seeks money damages *and* "money damages are the only remedy capable of redressing [his] injuries."  *Id.* at 917.  That rule originates in *Honig v. Doe*, 484 U.S. 305, 326–27 (1988)), in which the Supreme Court explained that both parents and schools filing an IDEA suit "may bypass the administrative process where exhaustion would be futile or inadequate."  (Citing *Smith,* 468 U.S. at 1014 n. 17; 121 Cong. Rec. 37416 (1975) (remarks of Sen. Williams) ("[E]xhaustion . . . should not be required . . . in cases where such exhaustion would be futile either as a legal or practical matter")).

*Covington* applied that principle to § 1415(l)'s exhaustion requirement for claims under other statutes that seek relief available under the IDEA.  205 F.3d 912 at 915, 917–18.  This, too, aligned with the IDEA's legislative history:  the committee reports that accompanied the draft of § 1415(l) explained that exhaustion was not to be required in certain circumstances, including when (1) "it would be futile to use the due process procedures"; (2) "an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law"; (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies"; and (4) an emergency situation exists."  H. R. Rep. 99-296, p. 7 (1985) (1985 House Report); *see also* S. Rep. 99-112, p. 15 (1986) (1986 Senate Report) (explaining that under the new provision, "if that suit could have been filed under the [IDEA], then parents are required to exhaust [IDEA] administrative remedies to the same extent as would have been necessary if the suit had been

filed under the [IDEA].  Exhaustion of [IDEA] administrative remedies would thus be excused where they would not be required to be exhausted under the EHA, such as when resort to those proceedings would be futile.")  One of the bill's Senate sponsors made the same point in his remarks in support of the proposed legislation on the Senate floor.  *See* 131 Cong. Rec. S10396-01 (1985) (remarks of Sen. Simon) ("It is important to note that there are certain situations in which it is not appropriate to require the exhaustion of [IDEA] administrative remedies before filing a civil law suit . . . .").

We have subsequently applied the *Covington* rule in other cases.  In *F.H. ex rel. Hall v. Memphis City Sch.*, 764 F.3d 638, 644 (6th Cir. 2014), the district court dismissed the § 1983 claim of a student (who had graduated) against his abusive aides for failure to exhaust under § 1415(l).  We reversed, reasoning that exhaustion was not required because the complaint centered on non-educational injuries, and so the administrative process could not "provide either the type of relief he seeks or any other type of remedy to redress wholly retrospective injuries." *Id.*  Here, Perez has graduated, has already received equitable relief that he alleges satisfied Defendants' obligation to provide him with a FAPE, and his IDEA claim was dismissed with prejudice.  He now seeks only money damages and declaratory relief under the ADA to compensate for the remaining unredressed harm—the discrimination he experienced and the resulting emotional and mental distress.  An administrative law judge is incapable of compensating that harm, *see* Mich. Admin. Code R. 340.1724f, and so in these circumstances, exhausting the IDEA's remedies would be impossible and futile.  *Covington*, 205 F.3d at 918; *F.H.* at 764 F.3d at 644.  This conclusion does not turn solely on Perez's request for money damages, as the majority contends, nor it relevant that exhaustion would have developed an administrative record.  Instead, *Covington* and *F.H.* make clear that the focus is on whether the IDEA's administrative process, designed to redress the inadequacy of a student's education, could have provided a remedy for the specific harms alleged by the plaintiff.  *Covington*, 205 F.3d at 918; *F.H.*, 764 F.3d at 644.  For Perez, it could not have.

A number of our sister circuits have reached the same conclusion in cases involving similar facts.  *See, e.g., Doucette v. Georgetown Pub. Schs.*, 936 F.3d 16, 30–32 (1st Cir. 2019) (finding exhaustion futile for § 1983 claim based on medical, emotional, and psychological

injuries, because plaintiff had already obtained administrative relief and therefore had no further remedies under the IDEA, the IDEA only authorizes equitable relief, and the administrative process would have provided only a "negligible benefit"); *Muskrat v. Deer Creek Public Schs.*, 715 F.3d 775, 785–86 (10th Cir. 2013) (section 1983 claim based on medical consequences of timeouts was not subject to exhaustion where plaintiffs had obtained modification of IEP through administrative channels; "given the steps [they] took and the relief they obtained, it would have been futile to then force them to request a formal due process hearing—which in any event cannot award damages—simply to preserve their damages claim"); *Witte v. Clark Cnty. Sch. Dist.*, 197 F.3d 1271, 1275–76 (9th Cir. 1999), *overruled on other grounds by Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 871 (9th Cir. 2011) (plaintiff seeking money damages under § 1983 for physical abuse was not required to exhaust IDEA's remedies where the parties had already informally agreed to provide the injured child with all remedies available under IDEA, and the child's injuries were retrospective); *W.B. v. Matula*, 67 F.3d 484, 496 (3d Cir. 1995), *overruled on other grounds* by *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 799 (3d Cir. 2007) (exhaustion not required for § 1983 plaintiffs seeking money damages because those damages were not available through administrative process and plaintiffs had received all other relief available to them under the IDEA through a settlement agreement).

As these authorities recognize, requiring litigants like Perez to "exhaust"—in other words, to reject an acceptable IDEA settlement offer—forces students to choose between immediately obtaining the FAPE to which they are entitled, or forgoing that education so they can enforce their ADA right of equal access to institutions. That is exactly the opposite of what Congress intended: to "reaffirm[] the viability" of the ADA and other federal statutes as "'separate vehicles,' no less integral than the IDEA, 'for ensuring the rights'" of children with disabilities. *See Fry*, 137 S. Ct. at 750 (quoting H.R. Rep. No. 99-296, p. 4).

The majority contends, however, that the language of § 1415(l)—stating that exhaustion is required for non-IDEA claims "to the same extent" as required for IDEA claims—means that "the administrative process's inability to award damages for emotional distress" cannot be a basis for a finding of futility, because that same excuse "would never allow a court to excuse the failure to exhaust an IDEA claim." Maj. Op. at 9. That logic is foreclosed by our governing

holdings that exhaustion is waived as futile or inadequate when a plaintiff seeks money damages for non-educational injuries and "[t]he administrative process cannot provide either the relief he seeks or any other type of remedy to redress wholly retrospective injuries," *F.H.*, 764 F.3d at 644; *see also Covington*, 205 F.3d at 918.  And it is simply untrue that "Congress meant to require procedural exhaustion" in that scenario.  *See* Maj. Op. at 10.  To the contrary, the legislature voted to pass § 1415(l) after hearing its sponsors state explicitly and repeatedly that exhaustion should be excused when "it is improbable that adequate relief can be obtained by pursuing administrative remedies," such as where "the hearing officer lacks the authority to grant the relief sought."  1985 House Report at 7; *see also* 1986 Senate Report at 15.  The majority's interpretation of § 1415(l) ignores the explanatory statements of the legislators who wrote this provision.

The majority also dismisses *Honig*'s announcement of the futility exception as mere dicta that, in any event, does not apply here.  Maj. Op. at 8–10.  In *Honig*, the Supreme Court was tasked with interpreting the so-called "stay-put" provision of the EHA, which required schools to keep students with disabilities in their current placement during the pendency of administrative proceedings under the statute.  484 U.S. at 308.  The petitioner, a school superintendent, contended the provision could not be read literally because it would have the "untenable[] result that school districts must return violent or dangerous students to school while the often lengthy EHA proceedings run their course."  484 U.S. at 323.  The Court disagreed, and in interpreting the provision narrowly, it explained that educators were not left "hamstrung" because they were entitled under the EHA to seek injunctive relief from the courts.  *Id.* at 325.  Nor did the exhaustion requirement render the possibility of judicial relief "more illusory than real."  *Id.* at 326.  Noting that "parents may bypass the administrative process where exhaustion would be futile or inadequate," the Court concluded the same exception was available to schools:  "[t]he burden in such cases, of course, rests with the schools to demonstrate the futility or inadequacy of administrative review, but nothing in § 1415(e)(2) suggests that schools are completely barred from attempting to make such a showing."  *Id.* at 327.  That reasoning was essential to the judgment because it explained why the Court's interpretation of the statute would not lead to absurd results.  *See, e.g.*, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if

alternative interpretations consistent with the legislative purpose are available"). It was not dicta. And every single one of our sister circuits has subsequently acknowledged the existence of the futility and inadequacy exceptions to exhaustion of the IDEA's administrative procedures. *See, e.g.*, *Doucette*, 936 F.3d at 31; *Nelson v. Charles City Cmty. Sch.Dist.*, 900 F.3d 587, 593 (8th Cir. 2018); *Durbrow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1191 (11th Cir. 2018); *Muskrat v. Deer Creek Pub. Sch.*, 715 F.3d 775, 786 (10th Cir. 2013); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 494 (7th Cir. 2012); *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 249 (2d Cir. 2008); *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 536 (4th Cir. 2002); *Matula*, 67 F.3d at 493; *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1303–04 (9th Cir. 1992); *Gardner v. Sch. Bd. Caddo Par.*, 958 F.2d 108, 111–12 (5th Cir. 1992); *Cox v. Jenkins*, 878 F.2d 414, 418–19 (D.C. Cir. 1989).

Finally, the majority opinion's contention that our obligation to follow *Honig*, *Covington*, and *F.H.* is obviated by *Ross v. Blake*, 136 S. Ct. 1850 (2016), *see* Maj. Op. at 9–10 n.*, is unsupported—indeed, contradicted—by the text of *Ross* itself. *Ross* presented the narrow question of whether, under the Prison Litigation Reform Act (PLRA), incarcerated litigants need not exhaust their remedies when it would be futile. *Id.* at 1854–55. Under the PLRA, "[n]o action shall be brought with respect to prison conditions under . . . Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Because that language is "mandatory," the Supreme Court reasoned, "a court may not excuse a failure to exhaust." *Ross*, 136 S. Ct. at 1856. This conclusion was supported by the specific history of the PLRA, which made clear that Congress had intended to reject the prior regime, in which exhaustion was discretionary. *Id.* at 1857. The Court was careful, however, to offer the following caveat:

> Of course, an exhaustion provision with a different text and history from § 1997e(a) might be best read to give judges the leeway to create exceptions or to itself incorporate standard administrative-law exceptions. See 2 R. Pierce, Administrative Law Treatise § 15.3, p. 1245 (5th ed. 2010). The question in all cases is one of statutory construction, which must be resolved using ordinary interpretive techniques.

*Id.* at 1858 n.2. By its own terms, then, *Ross* cannot be construed to silently impose a blanket prohibition on equitable exceptions to statutory exhaustion regimes. *Ross*, moreover, did not

announce a new rule of law; it reified an old one.  As the Court observed there, "[t]ime and again, this Court has taken [mandatory exhaustion] statutes at face value—refusing to add unwritten limits onto their rigorous textual requirements." *Id.* at 1857 (citing *McNeil v. United States*, 508 U.S. 106, 111 (1993); *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 12–14 (2000); 2 R. Pierce, Admin. L. Treatise § 15.3, p. 1241 (5th ed. 2010) (citing *Booth v. Churner*, 532 U.S. 731 (2001); *Shalala*, 529 U.S. at 13–15; *McCarthy v. Madigan*, 503 U.S. 140 (1992))).  In *Booth*, for example, the Court stressed that it would "not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise." 532 U.S. at 741 n.6.  In support, the Court cited *McCarthy*, 503 U.S. at 144—"[w]here Congress specifically mandates, exhaustion is required"—and *Weinberger v. Salfi*, 422 U.S. 749, 766–67 (1975), which explained that the statutory exhaustion requirement at issue was "more than simply a codification of the judicially developed doctrine of exhaustion, and may not be dispensed with merely by a judicial conclusion of futility."  *McCarthy*, in turn, relied on precedents from 1988 and 1982.  *See* 503 U.S. at 144 (citing *Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 579 (1989); *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 501 (1982)).

In other words, the principle applied to the PLRA in *Ross* was well established in 1988, when the Supreme Court concluded in *Honig* that as a matter of "statutory construction," *Ross*, 136 S. Ct. at 1856, the IDEA *is* susceptible to an exhaustion requirement.  *Ross* cannot be viewed as a turning point in the law that extinguished the precedents that came before.  Indeed, every court of appeal that has addressed futility or inadequacy arguments since June 2016, when *Ross* was decided, has accepted the continuing viability of those exceptions.  *See Doucette*, 936 F.3d at 33; *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 157 & n.3 (2d Cir. 2016); *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 136 (3d Cir. 2017); *Paul G. by & through Steve G. v. Monterey Peninsula Unified Sch. Dist.*, 933 F.3d 1096, 1102 (9th Cir. 2019), *cert. denied sub nom. Paul G. v. Monterey Peninsula Unified Sch. Dist.*, 140 S. Ct. 2672 (2020); *Nelson*, 900 F.3d at 594; *Durbrow*, 887 F.3d at 1193; *Heston, Next Friend of A.H v. Austin Indep. Sch. Dist.*, 816 F. App'x 977, 983 (5th Cir. 2020); *Z.G. by & through C.G. v. Pamlico Cnty. Pub. Sch. Bd. of Educ.*, 744 F. App'x 769, 777 (4th Cir. 2018).

In any event, even under *Ross*'s own analysis, the IDEA *does* have a "different text and history" from the PLRA, which make it susceptible to equitable exceptions.  *See Ross*, 136 S. Ct. at 1858 n.2.  Under the IDEA, a party "aggrieved by the findings and decision" of the state agency has "the right to bring a civil action with respect to the complaint" he or she presented to the agency.  20 U.S.C. § 1415(i)(2)(A), (C)(iii).  And before filing a civil action under another law protecting the rights of children with disabilities that "seek[s] relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter."  20 U.S.C. § 1415(l).  This language is meaningfully different from the much stronger, mandatory phrasing used in the PLRA: "[n]o action *shall* be brought."  42 U.S.C. § 1997e(a) (emphasis added).

And unlike the PLRA, the IDEA's legislative history demonstrates that Congress actively intended a futility exception to apply.  As the Supreme Court explained in *Honig*, the statute's principal author made clear that exhaustion was not to be required when it would be "futile either as a legal or practical matter."  *Honig*, 484 U.S. at 326–27 (quoting 121 Cong. Rec. 37416 (remarks of Sen. Williams)).  Similarly, in advocating for the passage of § 1415(l), the bill's sponsors made clear that standard futility and inadequacy exceptions to the exhaustion requirement would apply.  *See* 1986 Senate Report, p. 15; 1985 House Report, p. 7; 131 Cong. Rec. S10396-01 (remarks of Sen. Simon).

Courts have therefore permitted litigants to invoke that exception, as noted in *Smith*, 468 U.S. at 1014 n.17, as explicitly endorsed in *Honig*, and as evidenced by the precedents of all the courts of appeal.  *See supra*, at 21–22.  Yet even though the IDEA was amended after *Smith* and several times more in the years following *Honig*, Congress has never seen fit to revisit the language or scope of the exhaustion requirement.  That inaction in the face of Supreme Court decisions and unanimous circuit court agreement is probative, if not dispositive.  *See Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 458 n.4 (2015).  And it contrasts sharply with Congress's swift action in passing § 1415(l) to overrule *Smith's* holding, 468 U.S. at 1009, that the IDEA was the exclusive avenue through which a child with a disability could challenge the adequacy of his education.  *See Fry*, 137 S. Ct. at 750.

No. 20-1076                     *Perez v. Sturgis Pub. Schs., et al.*                     Page 25

"It is [the Supreme] Court's prerogative alone to overrule one of its precedents." *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (quoting *United States v. Hatter*, 532 U.S. 557, 567 (2001)). Its "decisions remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Id.* (quoting *Hohn v. United States*, 524 U.S. 236, 252–53 (1998)); *see also Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989).  Instead of heeding that limitation on this panel's authority, the majority today has chosen to overrule from below a precedent of our Supreme Court.

Nothing in *Ross* undermines or overrules the futility exception to exhaustion that was announced in *Honig* and applied by our court in *Covington* and later cases.  And because Perez seeks only money damages for emotional distress and "money damages are the only remedy capable of redressing [his] injuries," *Covington*, 205 F.3d at 915, he has adequately pled that exhaustion would be futile.

Perez, as "master of his claim," filed a cognizable complaint under the ADA that is supported by the governing precedent of the Supreme Court and this Circuit.  The majority opinion ignores that precedent and places us at odds with our sister circuits.  Because it is wrong to dismiss this case, I respectfully dissent.